**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | |
|---|---|
| LAURA EDWARDS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Case No. 1:16-CV-141-NAB |
| | ) |
| NANCY A. BERRYHILL,[1] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on Laura Edwards' ("Edwards") appeal regarding the

denial of disability insurance benefits and supplemental security income under the Social

Security Act. The Court has jurisdiction over the subject matter of this action under 42 U.S.C.

§ 405(g). The parties have consented to the exercise of authority by the United States Magistrate

Judge pursuant to 28 U.S.C. § 636(c). [Doc. 7.] The Court has reviewed the parties' briefs and

the entire administrative record, including the transcript and medical evidence. Based on the

following, the Court will affirm the Commissioner's decision.

### I.     Background

On April 4, 2013, Edwards applied for a period of disability, disability insurance benefits,

and supplemental security income, alleging disability since February 16, 2013. (Tr. 183-192.)

The Social Security Administration ("SSA") denied Edwards' claim and she filed a timely

---

[1] At the time this case was filed, Carolyn W. Colvin was the Acting Commissioner of Social Security. Nancy A. Berryhill became the acting commissioner of Social Security on January 20, 2017. When a public officer ceases to hold office while an action is pending, the officer's successor is automatically substituted as a party. Fed. R. Civ. P. 25(d). Later proceedings should be in the substituted party's name and the Court may order substitution at any time. *Id*. The Court will order the Clerk of the Court to substitute Nancy A. Berryhill for Carolyn W. Colvin in this matter.

request for hearing before an administrative law judge ("ALJ"). (Tr. 123-27, 130-31.) The SSA granted Edwards' request for review, and an administrative hearing was held on January 21, 2015. (Tr. 58-86, 133-40.) Edwards, represented by a non-attorney representative, testified at the hearing. (Tr. 58-86, 128.) Vocational expert ("VE"), Carly Coughlin[2] ("Coughlin"), also testified at the hearing. (Tr. 58-86.)

On January 29, 2015, the ALJ found Edwards not disabled as defined in the Society Security Act. (Tr. 11-23.) Edwards requested a review of the ALJ's decision from the Appeals Council. (Tr. 7.) On April 22, 2016, the Appeals Counsel of the Social Security Administration denied Edwards' request for review. (Tr. 1–6.) The decision of the ALJ thus stands as the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Edwards filed this appeal on June 22, 2016. [Doc 1.] The Commissioner filed an Answer and the certified Administrative Transcript on August 26, 2016. [Doc. 11, 12.] Edwards filed a Brief in Support of the Complaint on September 26, 2016. [Doc. 13.] The Commissioner filed a Brief in Support of the Answer on December 22, 2016. [Doc. 18.] Edwards then filed a Reply Brief on January 5, 2017. [Doc. 19.]

## II.    Standard of Review

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)1)A), 423(d)1)(A).

The SSA uses a five-step analysis to determine whether a claimant seeking disability benefits is in fact disabled. 20 C.F.R. §§ 404.1520(a)(1), 416.920(a)(1). First, the claimant must not be engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

---

[2] The VE's name was misspelled in the administrative hearing transcript as "Kylee Cocklin."

Second, the claimant must establish that he or she has an impairment or combination of impairments that significantly limits his or her ability to perform basic work activities and meets the durational requirements of the Act. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the appendix of the applicable regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant's impairments do not meet or equal a listed impairment, the SSA determines the claimant's Residual Functional Capacity ("RFC") to perform past relevant work. 20 C.F.R. §§ 404.1520(e) 416.920(e).

Fourth, the claimant must establish that the impairment prevents him or her from doing past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant meets this burden, the analysis proceeds to step five. At step five, the burden shifts to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs in the national economy. *Singh v. Apfel,* 222 F.3d 448, 451 (8th Cir. 2000). If the claimant satisfied all of the criteria under the five-step evaluation, the ALJ will find the claimant to be disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

The standard of review is narrow. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). This Court reviews the decision of the ALJ to determine whether the decision is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find adequate support for the ALJ's decision. *Smith v. Shalala,* 31 F.3d 715, 717 (8th Cir. 1994). The court determines whether evidence is substantial by considering evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006). The Court may not reverse just because substantial evidence exists that

would support a contrary outcome or because the Court would have decided the case differently. *Id.* If, after reviewing the record as a whole, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's finding, the Commissioner's decision must be affirmed. *Masterson v. Barnhart*, 363 F.3d 731, 726 (8th Cir. 2004).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole to consider:

>(1) The findings of credibility made by the ALJ;
>
>(2) The education, background, work history, and age of the claimant;
>
>(3) The medical evidence given by the claimant's treating physician;
>
>(4) The subjective complaints of pain and description of the claimant's physical impairment;
>
>(5) The corroboration by third parties of the claimant's physical impairment;
>
>(6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and
>
>(7) The testimony of consulting physicians.

*Brand. V. Sec'y of Dept. of Health, Educ. & Welfare,* 623 F.2d 523, 527 (8th Cir. 1980).

## III.    ALJ's Decision

The ALJ determined that Edwards met the insured status requirements of the Social Security Act through March 31, 2017, and had not engaged in substantial gainful activity since February 16, 2013. (Tr. 13.) The ALJ found that Edwards had the following severe impairments: peripheral vascular disease, fibromyalgia, and intellectual disability. (Tr. 13.) The

ALJ also found that Edwards did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14.) The ALJ determined that Edwards' mental impairments did not specifically meet the initial requirements for Listing 12.05C. (Tr. 15.) Although Edwards obtained a full scale IQ score of 66 on the Wechsler Adult Intelligence Scale- Fourth Edition ("WAIS-IV"),[3] this was taken "well after" the age of 22. (Tr. 15.) The ALJ also discussed Edwards' school records. While testing placed her at low-average range of cognitive and intellectual functioning, there was some question as to whether Edwards worked to her full abilities as a student. (Tr. 15.) Lastly, the ALJ reasoned that the evidence failed to show that Edwards had deficits in adaptive functioning. (Tr. 15.) Although Edwards' earnings record is not strong, the ALJ cited that she did earn $11,000 in 2010 as a dietary aide. She also can bathe, change her clothes, brush her teeth daily, and go to the grocery store. (Tr. 14-15.)

The ALJ also found that Edwards had the RFC to perform sedentary work with the following limitations: that she cannot work on scaffolds and must avoid all dangerous activities; she cannot ambulate on unimproved terrain; she is limited to simple or repetitive work; she should avoid close interaction with the public; she should avoid jobs that require more than simple interaction with supervisors; and she should avoid jobs that require teamwork with co-workers. (Tr. 16.) The ALJ found Edwards' testimony about her symptoms not entirely credible. He found that her medical records failed to reveal persistent, severe symptoms that would preclude her from working. (Tr. 18.) The ALJ determined that Edwards was not under a disability within the meaning of the Social Security Act from February 16, 2013, through the date of the decision. (Tr. 19.)

---

[3] The WAIS-IV is "a group of tests for assessment of intellectual functioning in adults." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1672 (32d ed. 2011).

## IV. Administrative Record

The following is a summary of relevant evidence before the ALJ:

### A. Hearing Testimony

The ALJ heard testimony from Edwards and Carly Coughlin, the VE. Edwards was represented by a non-attorney representative. (Tr. 58-86, 128.)

#### 1. Edwards' Testimony

Edwards testified that she was 42 years old at the time of the hearing. (Tr. 61.) She completed up to ninth grade of formal schooling and did not pass the GED test. (Tr. 62.) Edwards testified that she became disabled on February 16, 2013. (Tr. 62.) In discussing her conditions, she focused on her leg, knee, and foot pain in her testimony. (Tr. 62-63.) The severity of her conditions increased after being beaten with a crowbar by a former boyfriend in 2012. (Tr. 71.) She testified that she does not have any feeling in her feet and she lost circulation in her legs. (Tr. 62.)

Edwards testified that she could not stand for more than ten minutes. (Tr. 73.) She can only lift up to a gallon of milk in one hand. (Tr. 68.) She relies on walking with her cane. (Tr. 73.) Edwards spends more than half the day in a sedentary position with her legs elevated. (Tr. 73-74.) A home health nurse assists her with household chores seven days a week. (Tr. 75.) These chores include washing dishes, sweeping, and mopping. (Tr. 76.) Edwards also testified that she suffers from irritable bowel syndrome. (Tr. 77.) She has to go to the bathroom 15 times in the span of four hours in the morning. (Tr. 77.) She has had accidents before where her sons and her home health nurse had to clean up after her. (Tr. 77). Edwards also testified that she had migraine headaches and fibromyalgia. (Tr. 64-65.)

Edwards testified that she suffers from mental illness. (Tr. 69-70.) She has depression due to her sons being molested by their father. (Tr. 70.) Edwards takes medication for her depression, but does not see a psychiatrist because she cannot afford it. (Tr. 69-70.) Edwards testified that she has difficulty with her memory, and cannot remember directions. (Tr. 76.) She cannot concentrate on a task for more than 15 minutes, and does not usually finish it. (Tr. 76.) Edwards lives with her 11 year old son. (Tr. 61-62.) She has the mobility to engage in light housekeeping, including sweeping, cooking, and folding the laundry. (Tr. 65-66, 75-76.) She leaves the house only when she needs to pick her son up from school or to get groceries. (Tr. 66-67, 73.) For hobbies, she plays games with her son, colors, and watches TV. (Tr. 68-69, 77.)

### 2. Vocational Expert Testimony

Coughlin, a VE, testified regarding Edwards' vocational abilities and work history. (Tr. 81-84.) The VE testified that a hypothetical person of Edwards' age, education and work experience who was able to lift 20 pounds occasionally and 10 pounds frequently; avoided climbing ladders, ropes, and scaffolds; avoided working at unprotected heights and around dangerous machinery; avoided ambulating on unimproved terrain; limited to simple or repetitive work; avoided close interaction with the public, supervisors, and colleagues would be able to perform Edwards' past relevant work as a housekeeper. (Tr. 81-82.)

The ALJ then asked if there were any other jobs the hypothetical person could perform if the exertional level was reduced to sedentary, the maximum lifting was reduced to ten pounds and the maximum time to stand was two hours, but all other restrictions were the same as the previous hypothetical. (Tr. 82.) The VE testified that the hypothetical person could work in sedentary nonpublic jobs like document preparer and bench hand. (Tr. 82 -83.)

The VE also testified that if the hypothetical person missed more than two days a month at the described jobs, this would preclude competitive employment. (Tr. 83.) Additionally, if the hypothetical person had to leave work early frequently and could only be at work for 30 percent of the time, the VE stated that this situation would also preclude employment for the described jobs. (Tr. 83.) Finally, the VE testified that if the hypothetical person had to sit with their feet elevated at hip height, this would also be work preclusive. (Tr. 83-84.)

## B.    Record

### 1.    Education Records

At the age of twelve, Edwards' school evaluated her for a disability determination. (Tr. 261.) Edwards was referred to the school psychologist because her reading and math skills were at a third grade level, she did not stay on task and got easily distracted, and she found work too difficult. However, it was questioned whether she was working at her level of ability. (Tr. 261.)

On May 16, 1984, the school psychologist evaluated her with a variety of cognitive tests. (Tr. 262.) According to the psychologist's assessment, Edwards presented mental development within the borderline to low-average range. (Tr. 262.) The results were consistent with another IQ assessment that Edwards took when she was eight years old. Using the Wechsler Intelligence Scale for Children ("WISC"),[4] she showed depreciation in the cognitive area and a significant discrepancy between her verbal and performance scores. (Tr. 262.) Additionally, Edwards' visual-motor skills indicated the developmental age of approximately eight years, while her receptive language skills indicated a developmental age of nine years old. (Tr. 262.) These areas of development placed her in the borderline range. (Tr. 262.) However, the specific numerical result of Edwards' WISC was not disclosed.

---

[4] The WISC is "a group of tests for assessment of intellectual functioning in children ages 5 to 15." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1672 (32d ed. 2011).

The psychologist also noted that Edwards did not exhibit a severe discrepancy between her assessed mental development and then-present academic achievement. (Tr. 262.) Compared to her previous assessment in December 1980, she made "reasonable academic gains for her assessed ability level." (Tr. 262.) It was determined that she did not qualify for certification as a handicapped student. (Tr. 263.) However, it was determined that she would need supportive help in a general classroom, or should be placed in a self-contained classroom. (Tr. 263.)

## 2. Medical Records

### a. Primary Care Physician Dr. Wendell Elliott – Kneibart Clinic

Dr. Wendell Elliott at the Kneibart Clinic has been Edwards' primary care physician since September 17, 2010. (Tr. 269-306, 330-36.) Dr. Elliott treated Edwards for a variety of symptoms over the years, including fibromyalgia, anxiety, gastroesophageal reflux disease, chronic pain, hyperlipidemia, and peripheral vascular disease ("PVD"). (Tr. 269-306, 330-36.) On January 21, 2013, Dr. Elliott noted Edwards' stressful condition when she came in for a follow-up appointment. (Tr. 274.) She was tearful, shaky, and had lost 25 pounds since her last visit in August 2012. Dr. Elliott also noted that she had been recently beaten with a pipe by her abusive ex-boyfriend. (Tr. 275.)

On March 20, 2013, Edwards came in for another follow-up appointment, and stated that her left foot was turning numb and black. (Tr. 269-270.) Dr. Elliott noted that her left foot was a bit cool to the touch with a mottled color, but had palpable pulses. (Tr. 269-270.) In May 2013, Dr. Elliot's examination indicated the same symptoms as the March 2013 visit, but he also noted normal reflexes, coordination, muscle strength, and tone. (Tr. 331.) On April 14, 2014, Edwards went in again for a follow-up on her left knee symptoms. (Tr. 394-97.) Dr. Elliott ordered an Magnetic Resonance Imaging ("MRI") for her left knee. The results showed that she had intra-

9

substance tears and degenerative changes; multifocal tendon and ligament disease that caused mild to chronic sprains; inter-patellar plate and mild sprain; small knee effusion; and a very small Baker's cyst.[5] (Tr. 391-92.)

### b.    Poplar Bluff Regional Medical Center

On November 9, 2012, Edwards was admitted into the emergency room due to her being beaten by her boyfriend with a crow bar. (Tr. 316.) The physician noted that she appeared to be anxious and in obvious distress. (Tr. 317.) The physician also noted acute deformity, contusion, tenderness of the lateral aspect of the left thigh. (Tr. 317.) Edwards had muscle spasms, decreased range of motion, and pain in the lower back area. (Tr. 317.) The rest of the physical exam was otherwise normal. On April 12, 2013, Edwards was admitted for an angiogram of the abdomen, pelvis, and lower extremities. (Tr. 311.) Although she was diagnosed with bilateral claudication,[6] her radiology results indicated that she did not have significant arterial stenosis[7] or aneurysmal arterial dilation.[8] (Tr. 313.)

On June 24, 2013, Edwards was admitted into the emergency room for suicidal ideations and drug overdose. (Tr. 339-55.) She reported taking 10-20 Ativan because she was moderately upset about her boyfriend visiting his relatives and how he had taken her truck and wrecked it. (Tr. 343-344.) Edwards stated she was feeling hopeless and helpless. (Tr. 344.) She received a diagnosis of depression, severe and recurrent. (Tr. 344.) Additionally, the physician noted that Edwards had chronic pain due to fibromyalgia. (Tr. 344). She was discharged two days after

---

[5] A Baker's cyst is "a swelling behind the knee, caused by escape of synovial fluid which becomes enclosed in a membranous sac…" DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 458 (32d ed. 2011).

[6] Claudication is "a complex of symptoms characterized by pain, tension or weakness in a limb when walking is begun, intensification of the condition until walking becomes impossible, and disappearance of the symptoms after a period of rest. It is caused by reversible muscle ischemia that occurs in occlusive arterial disease of the limbs." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 369 (32d ed. 2011).

[7] Stenosis is "an abnormal narrowing of a duct or canal." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1769 (32d ed. 2011).

[8] An arterial aneurysm is an "aneurysm in the wall of an artery; chief signs are formation of a pulsating tumor…." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 82 (32d ed. 2011).

being admitted because her mood stabilized. (Tr. 339.) The physician noted her "fairly healthy" coping mechanisms. (Tr. 339.)

### c. Dr. Stanley Ziomek

On April 5, 2013, Dr. Stanley Ziomek evaluated Edwards for leg pain. (Tr. 322-323.) Dr. Ziomek noted that she had bilateral lower extremity pain that seemed to worsen with walking. (Tr. 322.) The left leg was worse than the right leg. (Tr. 322.) After the examination, Dr. Ziomek gave Edwards a note that stated, "No work until her severe leg pain is worked up." (Tr. 307.) During a follow-up appointment on April 19, 2013, Dr. Ziomek stated that her leg pain was probably due to small-vessel peripheral artery disease. (Tr. 324-325.)

### d. Consultative Examiner Jonathan D. Rosenboom, Psy.D.

On August 28, 2013, Dr. Jonathan Rosenboom, a psychologist, performed a psychological consultative examination for Edwards. (Tr. 357-366.) He administered a Wechsler Adult Intelligence Scale- Fourth Edition ("WAIS-IV") exam. Edwards received a full scale IQ score of 66 and a full scale IQ range of 63-71. (Tr. 362.) This score places her in the extremely low to mild mental retardation category. (Tr. 362.) Edwards' test results also exhibited a statistically rare and significant 20 point difference between her verbal comprehension and her perceptual reasoning index scores. (Tr. 362-63.) This discrepancy is indicative of focal learning deficits primarily in the verbal comprehension areas which ultimately impacted and limited Edwards' ability to benefit from educational experiences. (Tr 362-363.) She was diagnosed with major depressive disorder, mood disorder, post-traumatic stress disorder, cannabis abuse, and mild mental retardation. (Tr. 363.) Dr. Rosenboom found that Edwards' ability to understand, remember, and carry out complex instructions was moderately impaired by her limited cognitive ability. (Tr. 363.) Additionally, her ability to respond to work stressors was moderately

11

impaired by her mood disorder symptoms. (Tr. 363.) He also noted that Edwards maintained the capacity to manage her own finances. (Tr. 363.)

### e. Roxanne Pierce, LCSW – Kneibart Clinic

On September 23, 2013, Roxanne Pierce ("Pierce") saw Edwards for an initial therapy session for her mental health issues. (Tr. 412-413.) Pierce noted that Edwards appearance was appropriate; her speech was tearful; and her affect was depressed. (Tr. 412.) Edwards did not report suicidal or homicidal ideation, delusions, or hallucinations. (Tr. 412.) Pierce diagnosed Edwards with bipolar disorder. (Tr. 412.) On her follow-up visit on October 17, 2013, Pierce observed Edwards had a sad affect and depressed mood. (Tr. 409.) Pierce diagnosed Edwards with major depression, recurrent and generalized anxiety disorder. (Tr. 409.)

### f. Non-Examining State Agency Consultant James W. Morgan, Ph.D.

On September 26, 2013, Dr. James W. Morgan ("Dr. Morgan") reviewed the available records to complete a consultative examination on Edwards. (Tr. 97-98, 101-103.) Dr. Morgan found that Edwards was moderately limited in the ability to understand, remember, and carry out detailed instructions. (Tr. 101-102.) He also found her moderately limited in the ability to work with or in proximity to others without being distracted by them and the ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. 102.) Additionally, Dr. Morgan found that Edwards did not have adaptation limitations. (Tr. 102.) Dr. Morgan opined that Edwards retained the capability to perform at least simple repetitive tasks on a sustained basis in a low stress environment away from the public. (Tr. 103.)

### g. Advanced Pain Clinic

Edwards initially visited the Advanced Pain Clinic and Dr. Alfredo Romano on November 26, 2014 for knee pain. (Tr. 386.) A physical examination indicated diffuse tenderness on the cervical, thoracic, and lumbar spines. (Tr. 388.) The examination also indicated mild pain, tenderness, and crepitation on the left knee. (Tr. 389.) Dr. Romano diagnosed Edwards with osteoarthritis in the left knee, fibromyalgia, PVD for the lower extremities, and chronic pain syndrome.

On December 10, 2014, Edwards returned for a follow-up visit with Dr. Oluseyi Ogundimu. (Tr. 381.) She reported experiencing chronic pain due to her fibromyalgia and PVD. Edwards' physical examination was normal. (Tr. 383.) Edwards reported that her physical functioning was better and her mood was "ok." (Tr. 384.) Dr. Ogundimu noted that the physical examination for PVD was unremarkable and discontinued some of her narcotic medications. (Tr. 384.)

## V. Discussion

Edwards alleges two errors on review. First, Edwards asserts that the ALJ's determination that she failed to meeting Listing 12.05C is not supported by substantial evidence, because it does not account for her deficits in adaptive functioning. Second, Edwards asserts that the ALJ failed to include sufficient limitations regarding her mental limitations in the RFC, specifically regarding working in a low stress environment.

**A.     Listing of 12.05C Intellectual Disorder[9]**

First, Edwards asserts that the ALJ failed to properly assess her adaptive functioning impairments under Listing 12.05C.  The Commissioner responds that substantial evidence in the record supports the ALJ's finding that Edwards' impairments did not meet or equal a listing.

The listing of impairments in Appendix 1 describes for each of the major body systems impairments considered to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. §§ 404.1525(a), 416.925(a).  If a mental impairment is severe, the Commissioner must determine if it meets or is equivalent in severity to a listed mental disorder.  20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2).  To satisfy Listing 12.05 and establish an intellectual disability, a claimant must meet both the capsule definition in the listing's introductory paragraph and one of the four severity prongs (12.05 A-D).  20 C.F.R. pt. 404, subpt. P, app.1, § 12.00A; *Ash v. Colvin*, 812 F. 3d 686, 690 (8th Cir. 2016).   The capsule definition of an intellectual disability requires that a claimant must establish "significantly subaverage intellectual functioning with deficits in adaptive functioning" that manifested before the age of 22.  *Id*.  The severity prong of Listing 12.05C requires that the claimant additionally establish "a valid verbal performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation or function."  20 C.F.R. pt. 404, subpt. P, app.1, § 12.05.

Edwards' most recent IQ score of 66 falls within the prescribed range and Edwards has a qualifying physical limitation under Listing 12.05C.  Therefore, the only dispute is whether Edwards demonstrated limitations in adaptive functioning that initially manifested before age 22.

---

[9] The current regulation and the regulation in effect at the time of the ALJ's decision use different terms to describe the condition in 12.05.  The remainder of the text is the same.  The court will use the term intellectual disability as written in the current regulation.

The ALJ determined that Edwards failed to meet the limitation in adaptive functioning requirement, because he found that her school records did not show she tested within the intellectual disability range before age 22 and she failed to demonstrate deficits in adaptive functioning. (Tr. 14.) The ALJ noted that although Edwards' work history was "not spectacular," she did earn $11,000 in 20110. (Tr. 14.) He also noted that she was able to perform self-care activities, such as bathing, dressing, and brushing her teeth. (Tr. 15.) Finally, the ALJ stated that no examiner observed that Edwards had deficits in adaptive functioning. (Tr. 15.)

Edwards contends that the ALJ's analysis of her deficits in adaptive functioning is not supported by substantial evidence. Edwards contends that an IQ score is not required to demonstrate deficits in adaptive functioning before age 22. Edwards notes that her education records show that during childhood, she was developing in the borderline to low average range, she did not complete school beyond the 9th grade, and she failed to obtain a GED. Edwards also notes that she only worked part-time and the work was not considered substantial gainful activity[10] (SGA) under the SSA regulations. Finally, Edwards states that ALJ erroneously failed to consider Dr. Rosenboom's diagnosis of mild mental retardation or intellectual disability as evidence of deficits in adaptive functioning.

As an initial matter, "merely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing." *McCoy v. Astrue*, 648 F.3d 605, 611-12 (8th Cir. 2011); 20 C.F.R. §§ 404.1525(d), 416.925(d) (An impairment cannot meet a listing based solely on a diagnosis). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria."

---

[10] "Substantial gainful work activity is work activity that is both substantial and gainful: Substantial work activity is work activity that involves doing significant physical or mental activities. … Gainful work activity is work activity that you do for pay or profit." 20 C.F.R. §§ 404.1572(a)-(b), 416.972(a)-(b).

*Jones v. Astrue*, 619 F.3d 963, 969 (8th Cir. 2010) (emphasis in original).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 529-30 (1990) (superseded by statute on other grounds).  "The claimant has the burden of proving that her impairment meets or equals a listing."  *Carlson v. Astrue*, 604 F.3d 589, 593 (8th Cir. 2010).

The SSA guidelines refer to adaptive functioning as "how you learn and use conceptual, social, and practical skills in dealing with common life demands."  20 C.F.R. pt. 404, subpt. P, app.1, § 12.00H(3)(a-b).  "It is your typical functioning at home and in the community, alone or among others."  *Id*.  Deficits in adaptive functioning can be proved "from a variety of sources." *Id*.  While Edwards' IQ score placed her in the mild mental retardation category, Dr. Rosenboom ultimately concluded that her mental impairments only moderately restricted her ability to carry out complex instructions and respond appropriately to work stressors.  (Tr. 363.)  He also noted that Edwards had the capacity to manage her finances.  (Tr. 363.)

Edwards' limitations, when considered together with her abilities, do not compel the conclusion that her limitations meet or equal Listing 12.05C.  *See Scott v. Berryhill*, No. 16-1931, slip op. at 4-7 (8th Cir. Apr. 28, 2017) (claimant who did not complete high school, obtained 63 IQ score, read poorly, cannot manage finances or complete forms without assistance, but lived independently, drove, shopped, and had a good memory did not meet Listing 12.05C's requirements for deficits in adaptive functioning); *Ash v. Colvin*, 812 F.3d 686, 690-93 (8th Cir. 2016) (claimant's diagnosis of mild mental retardation, special education classes, and special work accommodations did not outweigh her ten year work history, ability to shop independently, manage finances, and only moderate limitations in sustaining attention and concentration in determining the existence of deficits of adaptive functioning).  The record viewed as a whole

indicates that Edwards has some limitations, but not to the degree that would demonstrate the deficits in adaptive functioning required to meet Listing 12.05C. Therefore, the Court finds that the ALJ's finding that Edwards did not meet Listing 12.05C is supported by substantial evidence.

### B.      Mental Residual Functional Capacity

Next, Edwards asserts that the ALJ's determination of her mental RFC is not supported by substantial evidence, because the ALJ did not include any limitations regarding stress level, failed to weigh Dr. Rosenboom and Dr. Morgan's opinions in the record, and failed to explain what evidence supported the determination. The RFC is defined as what the claimant can do despite his or her limitations, and includes an assessment of physical abilities and mental impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC is a function-by-function assessment of an individual's ability to do work related activities on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).[11] It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and the claimant's own descriptions of his limitations.. *Pearsall*, 274 F.3d at 1217. An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. *See Cox*, 471 F.3d at 907. "[T]he ALJ is not qualified to give a medical opinion but may rely on medical evidence in the record." *Wilcockson v. Astrue*, 540 F3d 878, 881 (8th Cir. 2008). In making a disability determination, the ALJ shall "always consider the medical opinion in the case record together with the rest of the relevant

---

[11] A "regular and continuing basis" means 8 hours a day, for 5 days a week, or equivalent work schedule. SSR 96-8p, 1996 WL 374184, at *1.

evidence in the record."  20 C.F.R. §§ 404.1527(b), 416.927(b)[12]; *see also Heino v. Astrue*, 578

F.3d 873, 879 (8th Cir. 2009).

The ALJ determined that Edwards had the RFC to perform sedentary work with the

following limitations: that she cannot work on scaffolds and must avoid all dangerous activities;

she cannot ambulate on unimproved terrain; she is limited to simple or repetitive work; she

should avoid close interaction with the public; she should avoid jobs that require more than

simple interaction with supervisors; and she should avoid jobs that require teamwork with co-

workers.  (Tr. 16.)  Edwards claims that the ALJ erred in not considering Dr. Rosenboom and Dr.

Morgan's assessment that she needed to work in a low- stress environment. Based on a review of

the evidence in the record as a whole, the Court finds that substantial evidence supports the

ALJ's RFC determination regarding Edwards' mental impairments.

Although the ALJ did not weigh the opinions of Drs. Rosenboom and Dr. Morgan, the

failure to do so was not reversible error.  If the RFC assessment conflicts with an opinion from a

medical source, the adjudicator must explain why the opinion was not adopted.  SSR 96-8p, 1996

WL 374184, at *7.  (July 2, 1996).  In this case, there is no conflict between the doctors'

opinions and there is no conflict between the RFC determination and the doctors' opinions.  Dr.

Rosenboom's opinion stated that Edwards' "ability to respond appropriately to work stressors is

moderately impaired by her mood disorder symptoms."  (Tr. 363.)  Dr. Morgan stated that

Edwards "retains the capability to perform at least simple repetitive tasks on a sustained basis in

a low stress environment."  (Tr. 117.)  The ALJ's RFC determination is consistent with those

opinions by limiting Edwards to simple, repetitive work; limiting her interaction with the public,

---

[12] The Court notes that this social security regulation has changed effective March 27, 2017.  Because this claim was filed in April 2013, the Court will use the prior versions of the regulations effective at the time that Edwards' application for benefits was filed. *See* 20 C.F.R. §§ 404.614, 404.1527, 416.927 (version effective March 27, 2017).

supervisors, and co-workers; and limiting her from work that required teamwork with co-workers. (Tr. 16.)  The ALJ's language does not have to exactly match the language used in the doctors' opinions.

Moreover, an ALJ is not required to discuss every piece of evidence submitted.  *Wildman v. Astrue*, 596 F.3d at 966 (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)).  Although the ALJ did not recite the doctors' statements, Edwards admits that the mental RFC "somewhat reflects the findings in each opinion."  *See Wildman*, 596 F.3d at 966 (given the ALJ's specific reference to findings set forth in the doctor's notes, it is highly unlikely that the ALJ did not consider and reject the doctor's statement that claimant was markedly limited).

This case is distinguishable from *McCadney v. Astrue*, where the Eighth Circuit remanded because the ALJ did not mention the claimant's dementia diagnosis, which was likely case determinative.  *See McCadney v. Astrue*, 519 F.3d 764, 767 (8th Cir. 2008).  Here, Edwards contends that the ALJ's limitations given do not fully address the need to work in a low stress environment as explicitly stated in the doctors' opinions.  For this case, the failure to use the phrase "low stress environment" is not case determinative, as the restrictions that were included in the RFC can be construed to address the need for a low stress environment.  It is unlikely that the inclusion of a more specific discussion regarding the doctors' opinions would have changed the outcome.  *See Westall v. Berryhill*, No. 4:16-CV-66 CEJ, 2017 WL 1105125 at *18 (Mar. 24, 2017).  Therefore, the Court finds that the ALJ's RFC determination regarding Edwards' mental impairments is supported by substantial evidence.

## VI.    Conclusion

As noted earlier, the ALJ's decision should be affirmed "if it is supported by substantial evidence, which does not require a preponderance of the evidence but only 'enough that a

reasonable person would find it adequate to support the decision,' and the Commissioner applied the correct legal standards." *Turpin v. Colvin*, 750 F.3d 989, 992-93 (8th Cir. 2014). The Court cannot reverse merely because substantial evidence also exists that would support a contrary outcome, or because the court would have decided the case differently. *Id.* A review of the record as a whole demonstrates that Edwards has some restrictions in her functioning and ability to perform work related activities, however, she did not carry her burden to prove a more restrictive RFC determination. *See Pearsall*, 274 F.3d at 1217 (it is the claimant's burden, not the Social Security Commissioner's burden, to prove the claimant's RFC). For reasons set forth above, the Court affirms the Commissioner's final decision.

Accordingly,

**IT IS HEREBY ORDERED** that the relief requested in Plaintiff's Complaint and Brief in Support of Complaint is **DENIED**. [Docs. 1, 13]

**IT IS FURTHER ORDERED** that the Court will enter a judgment in favor of the Commissioner affirming the decision of the administrative law judge.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall substitute Nancy A. Berryhill for Carolyn W. Colvin in the court record in this case.

Dated this 10th day of May, 2017.

    /s/ Nannette A. Baker
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE